Mary L. HOOKER, et al., Appellants,

v.

The EDES HOME, et al., Appellees.

Nos. 89–1316, 89–1534.

District of Columbia Court of Appeals.

Argued May 16, 1990.
Decided July 13, 1990.

J. William Koegel, Jr., with whom Harry Lee, Rita A. Cavanagh, and Cynthia L. Quarterman, Washington, D.C., were on the brief, for appellants.

Neal A. Jackson, with whom Lynn C. Fields, Allen M. Hutter, Washington, D.C., and Ronald L. Webne, Alexandria, Va., were on the brief, for appellees.

Before TERRY, SCHWELB and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Four female, elderly and unmarried residents of the District of Columbia appeal from the trial court's ruling that they lack standing to maintain a class action. They sought to challenge the closing, sale and relocation of a free home (the "Edes Home") for elderly, indigent widows residing in Georgetown proposed by the Board of Trustees of a charitable corporation (the Trustees or Board) established by a testamentary bequest, and chartered by Congress in 1906, for the purpose of maintaining such a home.[1] They also appeal from

---

1. The plaintiffs, Mary Hooker, Alice Ruddiman, Marle Haentiens, and Willie Mae Stanley, sued in a representative capacity on behalf of "eligible potential residents of Edes."

the trial court's denial of their application to intervene in a probate action initiated by the Trustees to obtain court approval of the Board's proposals.[2]

Because the will, charter, and by-laws of the corporation establish a set of criteria identifying a limited class of potential beneficiaries of the charitable trust, we conclude that members of that class have a "special interest" in the trust distinct from that of members of the public at large, notwithstanding the Trustees' discretion to exclude them from the trust benefits. We further hold that at least one of the appellants—Mary Hooker—presently qualifies as a representative member of that class. Because she challenges a fundamental change in the nature of the institution that may substantially affect the interests of all potential beneficiaries, we conclude that the policy goals of the traditional rule limiting standing to enforce a charitable trust to a public officer would not be served by denying standing to her, and reverse the judgment.[3]

## I. *Background and Proceedings Below*

In 1905, Margaret Edes executed a will establishing, and bequeathing the residue of her estate to, a charitable institution known as the "Edes Home." The Edes Home was to maintain "free from the control of any particular religious sect or persuasion, ... a free Home for aged and indigent Widows, residing, or to reside," in that part of the District of Columbia then known as Georgetown, where the Home was to be located.

Pursuant to instructions in the will directing establishment of a charitable corporation under the laws of the District of Columbia, on May 1, 1906, Congress chartered the Edes Home, providing for its "perpetual succession" for the purpose of "erect[ing] and forever maintain[ing] and support[ing] in [Georgetown], a home for aged and indigent widows...." The charter empowered the corporation, through its Board of Trustees, to "acquire, take, receive, invest, reinvest, and dispose of property ... for the use and benefit of [the Home]"; to "determine how many and what particular persons of those qualified for admission unto the said home shall actually be received therein"; to "exclude, at pleasure from said home any person who shall have been admitted"; and to establish and execute such by-laws not inconsistent with the charter as it deemed fit "in the interests of the said home."

In the by-laws, the Board of Trustees established additional admission criteria beyond those set out in the will and charter, ensuring that residents of Edes Home would be in good health and not in need of nursing care:

No application for admission shall be considered except from aged and indigent widows who must be in good health and who have been for at least five years immediately preceding the date of application residents of Georgetown. A certificate as to health shall be required from a physician known to the Corporation. The Corporation shall pass upon all applications. Before admission a deposit

2. As discussed more fully later in text, the Civil Division consolidated the Trustees' probate action, *Trustees of The Edes Home v. Corporation Counsel,* FID–1–89, with appellants' class action and a suit brought by two residents of Edes House, *Brown, et al. v. The Edes Home, et al.,* C.A. No. 7692–87. *See* Super.Ct.Civ.R. 42 (1989). The consolidated case was then designated a Civil I action pursuant to Super.Ct. Civ.R. 40–II. This court consolidated the appeals from the grant of summary judgment for lack of standing (No. 89–1316) and the denial of the application for leave to intervene (No. 89–1534).

3. Because we hold that at least one appellant has standing to challenge the Trustees' proposals as a class representative, we need not resolve

the question whether she—or the other three appellants—should have been allowed to participate in the probate action as intervenors under Super.Ct.Civ.R. 24. Appellants assert that they filed their motion to intervene in the probate action "to insure that they would have the opportunity to raise their claims and defenses in the probate proceedings without being blocked by technical distinctions between probate and civil practice and procedure." As the probate and other actions have been consolidated and designated a Civil I action, *see* note 2, *supra,* and at least one of the appellants has standing to participate in that action on behalf of all members of the class of potential beneficiaries, we dismiss as moot appeal No. 89–1534.

of at least seventy-five dollars must be made to defray funeral expenses. The Board may, however, by a unanimous vote, waive the requirements of this rule as to length of residence preceding the application in meritorious cases coming within the letter and spirit of the will and charter.[4]

From the time of its charter until the present, the Edes Home has operated Edes House, an 18–room boarding house located at 2929 N Street, N.W., providing lodging, board and housekeeping services to its residents. Apparently, Edes House has never achieved full capacity of eligible elderly widows.[5]

In 1986, assertedly because of declining interest on the part of eligible elderly individuals living there [6] and the depletion of trust resources from increasing costs of operating an obsolete facility, the Trustees resolved to close the 2929 N Street residence and to transfer the assets of the trust to the Washington Home for Incurables, a residential care facility for the chronically or terminally ill located about a mile from Georgetown. In July 1986, the Trustees resolved to authorize a law firm to develop a plan to merge Edes Home with the Washington Home, and to authorize the sale of Edes House. By this time the Trustees had stopped accepting applications for residency. In February 1987, the Trustees voted to close Edes House and to relocate its residents. On June 30, 1987, the Trustees wrote to residents, informing them of the plan to close the facility within 90 days. In September 1987, a contract of sale on the House was secured for $1.2 million.

In September 1987, Virgie Brown, a resident of Edes House, filed suit in Superior

Court challenging the Trustees' actions and seeking a temporary restraining order enjoining her eviction. In October another resident, Elizabeth Ross, joined as a party plaintiff. As later amended, the complaint named all four trustees in their individual capacity, alleging breach of fiduciary duty, *ultra vires* acts by the Trustees, and failure to act in the best interests of the trust beneficiaries. Apparently the parties reached an agreement, with the approval of Judge Beaudin, that the plaintiffs would not be evicted while an effort to secure alternative housing was made. Ms. Brown subsequently died, leaving only Ms. Ross as plaintiff in the *Brown* suit.

On January 5, 1989, the Trustees filed a complaint in the Probate Division of the Superior Court, naming as defendant the Corporation Counsel of the District of Columbia and seeking approval of the closure of Edes House, transfer of the trust assets including the proceeds of the sale of Edes House to the Washington Home, and continuation of the functions of the Edes Home at that location. The complaint alleged that the Washington Home had agreed to assume responsibility for maintaining living units for elderly widows eligible under the terms of the Edes will, and to select residents according to the criteria set out therein, but that the Edes Home will continue to exist as a corporate entity and to administer the trust's assets for the benefit of elderly, indigent, female residents of those living units according to the purposes of the Edes will. Ms. Ross, the remaining plaintiff in the *Brown* case, moved to consolidate her suit with the probate matter.

On March 27, 1989, appellants filed the instant class action in the Civil Division on

---

4. The Board of Trustees originally adopted by-laws in 1906; the quoted excerpt is from a version as amended through 1983.

5. The Edes Home from time to time has permitted individuals such as foreign students who do not meet the admission criteria set out in the will, charter and by-laws to reside at Edes House. The Board acknowledges that it has rented rooms to fill excess capacity and reduce the drain on the endowment, but maintains that on these occasions it did not provide the tenants with the services furnished eligible residents,

and that at all times it kept rooms open for eligible widows.

6. The trustees represent that, until 1987, "the Board actively recruited residents, running newspaper advertisements, contacting religious organizations in the greater Northwest area, working with social services agencies and drawing upon community organizations," and still was unable to fill Edes House with eligible widows.

behalf of themselves and a class of all "eligible potential residents of Edes" numbering "in the hundreds, if not the thousands." They alleged that: the Board had kept the existence of Edes House's housing opportunities a "well-hidden secret" by failing to publicize them and by refusing to consider submitted applications; contrary to the Board's assertion, there were many elderly indigent citizens who would want to live at Edes; trust assets were sufficient to permit the continued operation of the House; the Board's proposal to sell the House without court approval was *ultra vires;* and the Board's operation of and plan to close and sell the House violated the congressional charter. Appellants moved to consolidate the *Brown* suit, the probate matter and the class action, and for certification of the consolidated case as a Civil I action. Shortly thereafter, appellants also moved to intervene in the probate matter. The cases were consolidated on May 11, 1989, and on August 28, 1989, were designated a Civil I case and assigned to Judge Taylor.

The Trustees moved to dismiss the claims of the class plaintiffs for lack of standing, and because the motion relied on facts outside the pleadings, Judge Taylor treated the motion as a motion for summary judgment. On October 30, 1989, she granted judgment in the Trustees' favor against the plaintiffs in the class action. It was undisputed that the class plaintiffs were unmarried, female residents of the District of Columbia, ranging in age from 60 to 81 years old. None had ever attempted to apply to the Home until one month after the probate action was filed, and even after the applications were completed, they were not submitted to the Trustees because the Board had stopped processing applications in anticipation of closing Edes House.

Citing *YMCA v. Covington*, 484 A.2d 589 (D.C.1984), the trial court concluded that the Edes Home was a charitable trust, and that a suit for enforcement of a charitable trust could only be maintained by the Attorney General or other public officer, or a person having a "special interest" in the enforcement of the trust distinguishable from that of any other member of the public. The court found two of the class plaintiffs ineligible for admission according to the terms of the trust because they were not widows, and therefore lacked at the outset the requisite "special" interest.[7] Moreover, the court concluded, the mere fact that the other two were *potential* beneficiaries of the trust—in the sense that they met the criteria for admission—did not confer upon them the requisite interest because the Trustees had discretion to deny them such benefits at will. Accordingly, the court concluded, the Trustees were entitled to judgment as a matter of law on their motion.

## II. *Standing to Enforce a Charitable Trust*[8]

### A. *Exclusivity of Official Enforcement Power*

■ As distinguished from a private trust, which is characterized by identified beneficiaries who enjoy equitable ownership of the property and for whose benefit the trustees are obliged to act, in a charitable trust "the obligation of the trustee is to apply the trust res for some form of public benefit, and persons who receive[ ] advantages from the administration of the trust do so because they are conduits through whom the social gains flow," and not necessarily because they have a property interest in the trust assets. G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 411, at 407 (2d ed. rev. 1977); RESTATEMENT (SECOND) OF TRUSTS, chap. 11 introductory note (1959) (fundamental distinction between private and charitable trusts is that, in charitable trust, "property is devoted to purposes beneficial to the community").

Though specific individuals or members of a class of individuals may receive a

---

7. Contrary to the trial court's conclusion, one of these two appellants, Alice Ruddiman, averred in her affidavit that she was a widow. *See* note 14, *infra.*

8. Although Edes Home is technically a charitable corporation chartered by Act of Congress, the trial court concluded, and the parties agree, that rules applying to charitable trusts govern the standing issue.

benefit from time to time, because the interest in ensuring that charitable trust property is put to proper purposes is properly that of the community at large, the traditional rule has been that only a public officer, usually the state Attorney General, has standing to bring an action to enforce the terms of the trust. *See* RESTATEMENT (SECOND) OF TRUSTS, *supra*, § 391 & comment *a*; 4A W. FRATCHER, THE LAW OF TRUSTS § 391, at 356–60 (4th ed. 1989); G. BOGERT, *supra*, § 411, at 409–11.[9] Principally, the rationale for vesting exclusive power in a public officer stems from the inherent impossibility of establishing a distinct justiciable interest on the part of a member of a large and constantly shifting benefited class, and the recurring burdens on the trust res and trustee of vexatious litigation that would result from recognition of a cause of action by any and all of a large number of individuals who might benefit incidentally from the trust. G. BOGERT, *supra*, § 411, at 414.

## B. *The "Special Interest" Exception*

An exception to the general rule, recognized by this court, exists in situations where an individual seeking enforcement of the trust has a "special interest" in continued performance of the trust distinguishable from that of the public at large. *YMCA v. Covington, supra*, 484 A.2d at 591–92; RESTATEMENT (SECOND) OF TRUSTS, *supra*, § 391 & comment *c*. In these situations, though the private beneficiary is the "conduit" through which broader community benefits flow, the plaintiff sues to secure an individualized interest in the trust, and the problems presented by suits from a "practically limitless and wholly indefinite group of persons," *Mount Vernon Mortgage Corp., supra* note 9, 98 U.S.App.D.C.

at 430, 236 F.2d at 725, are less pronounced.

While "special interest" is a term of uncertain scope, it appears that at least a clearly identified intended beneficiary has a justiciable interest in enforcement of the trust. Comment *c* of section 391 of the Restatement sets out examples of what constitutes a "special interest" within the meaning of the exception. Most address situations where the trust was created to benefit *identified* persons (*e.g.*, the current minister of a specific church) or entities (*e.g.*, a specific church or charitable organization). *See* RESTATEMENT (SECOND) OF TRUSTS, *supra*, § 391 comment *c*. In the present case, however, persons for whose benefit the Edes trust was created are not identified with that degree of particularity, but instead categorically. In these situations, the general rule is that "one who is merely a possible beneficiary ... or a member of a class of possible beneficiaries, is not entitled to sue for enforcement of the trust." *Alco Gravure, Inc. v. Knapp Found.*, 64 N.Y.2d 458, 465, 490 N.Y.S.2d 116, 119, 479 N.E.2d 752, 755 (1985); RESTATEMENT (SECOND) OF TRUSTS, *supra*, § 391 comment *c*; *Kania v. Chatham*, 297 N.C. 290, 291–93, 254 S.E.2d 528, 530 (1979). Older cases treat persons who fairly represent a class of *identifiable* (but not identified) beneficiaries as mere "possible" beneficiaries, denying them standing. *See, e.g., Revici v. Conference of Jewish Material Claims Against Germany*, 11 Misc.2d 354, 174 N.Y.S.2d 825 (N.Y.Sup.Ct.1958) (where trust was to benefit persons suffering damage as a result of Nazi persecution, suit could only be maintained by Attorney General; person injured by Nazis lacked standing).[10]

**9.** Unlike many jurisdictions, the District of Columbia does not have a statute specifically authorizing such actions, but courts in this jurisdiction recognize the power of a public officer to sue in a *parens patriae* capacity to enforce the public right to continuing application of charitable trust property to proper purposes. *See Mount Vernon Mortgage Corp. v. United States*, 98 U.S.App.D.C. 429, 430, 236 F.2d 724, 725 (1956), *cert. denied*, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957).

**10.** *See also Clevenger v. Rio Farms Inc.*, 204 S.W.2d 40 (Tex.Civ.App.1947) (where land settlement trust was to benefit low income farmers, suit could only be maintained by Attorney General, not low income farmers); *Averill v. Lewis*, 106 Conn. 582, 138 A. 815 (1927) (where trust was to benefit white, Protestant, female teachers in a certain county, one hundred ten such teachers lacked standing to appeal accounting decree); *Krauthoff v. Attorney General*, 240 Mass. 88, 132 N.E. 865 (1921) (where trustees have discretion to give funds to charitable societies to

The Restatement goes on to state, however, that

> where a charitable trust is created for the *members of a small class of persons, a member of the class can maintain a suit on behalf of himself and the other members of the class [to enforce the trust].* Thus, where a charitable trust is created for the poor members of a particular church, any such member of the church can maintain a suit against the trustees....

RESTATEMENT (SECOND) OF TRUSTS, *supra,* § 391 comment *c* (emphasis added). This may reflect what Professor Bogert identifies as a modern trend in cases "suggest[ing] some change from the more traditional approach by permitting persons deemed to represent a class of actual *or prospective* beneficiaries to bring suit to enforce the charitable trust." G. BOGERT, *supra,* § 411, at 446 (emphasis added). These decisions recognize that application of the strict traditional rule denying standing to "potential" beneficiaries of a charitable trust may be inimical to trust purposes in cases where a suit to enforce the trust does not present the dangers the rule was intended to guard against. Illustrative is *Alco Gravure, supra,* in which the court, while noting the general rule that excludes "member[s] of a class of *possible* beneficiaries," defined the exception as embracing "a particular group of people [which] has a special interest in funds held for a charitable purpose ... and *the class of potential beneficiaries is sharply defined and limited in number....*" 64 N.Y.2d at 465, 490 N.Y.S.2d at 119, 479 N.E.2d at 755 (emphases added).

Appellants contend the trial court erred in concluding that, to have standing to enforce the trust, the plaintiffs must be *present* beneficiaries of the trust, in the sense that they must already have been selected by the Board of Trustees to reside in the House. They argue that the Trustees' discretion cannot encompass the power to confer or deny standing on persons who otherwise meet the admission criteria—persons in the very class the settlor intended

to benefit—when such persons do not challenge denial of benefits to them specifically, but to the class of intended beneficiaries. The Trustees state the legal proposition on which they prevailed below as follows: "when trustees are invested with discretion to choose the beneficiaries of a trust from potential candidates, a person has no standing to sue the trust unless he or she has been chosen as a beneficiary, even though he or she may meet the threshold requirements of eligibility."

In support of their arguments, both sides cite *YMCA v. Covington, supra,* in which this court held that members of a YMCA branch which the YMCA proposed to relocate had a "special interest" in the trust distinct from that of other members of the public. 484 A.2d at 592. According to the Trustees, *YMCA* compels the conclusion that standing is limited to persons with a *current right to enjoy the trust benefits.* Appellants counter that *YMCA* does not limit standing to current beneficiaries, and that there we conferred standing on the members not because they were members *per se* but because of the nature of their interest in the particular facility, the closing of which would injure them in a way different from the general public. *YMCA,* we conclude, does not decide the issue presented here. In that case the persons challenging the trustees' action *in fact* were members of the branch, and we had no occasion to decide whether, or under what circumstances, non-members desirous of membership would have standing to bring suit. For our purposes *YMCA* merely underscores that the essence of a "special interest" in a charitable trust is a particularized interest distinct from that of members of the general public. *See Lokey v. Texas Methodist Found.,* 479 S.W.2d 260, 265 (Tex.1972), *cited with approval in YMCA v. Covington, supra,* 484 A.2d at 591.

The Trustees also rely (as did the trial judge) on *Kania v. Chatham, supra,* as establishing the general rule that a potential, as opposed to current, recipient of trust benefits cannot enforce the trust.

aid the indigent, no particular organization can      sue to force trustees to give funds to it).

The Supreme Court of North Carolina in *Kania* did regard the plaintiff's asserted status as a potential beneficiary as fatal to his claim, noting that "the mere fact that a person may, in the discretion of the Trustees, become a recipient of the benefit under the trust does not entitle him to maintain a suit for the enforcement of the trust." The opinion went on to state, however, that "we do not mean to imply that a potential beneficiary of a charitable trust can never avail himself of legal process to enforce the provisions of such a trust." 297 N.C. at 293, 254 S.E.2d at 530. Key to *Kania* was a factor to be discussed momentarily: the avoidance of a multiplicity of lawsuits challenging the trustee's discretionary day-to-day administration of the trust.

■ We reject a "current beneficiary" restriction which, at least as alleged in this case, would reserve to the Trustees the power to confer or deny standing to question their actions by refusing to act on applications and awaiting the natural diminution of the class of current beneficiaries by attrition.[11] The better reasoned view—consistent with the Restatement's recognition of representative standing for a member of a "small class of persons"—is that a particular class of potential beneficiaries has a special interest in enforcing a trust if the class is sharply defined and its members are limited in number. *Alco Gravure, supra,* 64 N.Y.2d at 465, 490 N.Y.S.2d at 119, 479 N.E.2d at 755. *See also St. John's–St. Luke Evangelical Church v. National Bank,* 92 Mich.App. 1, 13–19, 283 N.W.2d 852, 858–60 (1979) (where class of beneficiaries not "uncertain and indefinite," standing should not be denied), *distinguishing Oleksy v. Sisters of Mercy,* 74 Mich.App. 374, 253 N.W.2d 772 (1977); *Gray v. St. Matthews Cathedral Endowment Fund,* 544 S.W.2d 488, 491 (Tex.Ct. Civ.App.1976) ("problems of identification of beneficiaries and of undue harassment are not present when the class of persons to be benefited is a small, identifiable

group, as distinguished from the public generally").

■ We go further, however, and adopt another limiting factor as well. Even when a class of potential beneficiaries is small and distinct enough that its members appear to have an interest distinguishable from the public's, the problem of subjecting the trustees to recurring vexatious litigation may exist. Where potential beneficiaries are identified categorically (for example, as elderly indigent widows), the eligible class by nature will expand and contract continuously, and recognizing a representative member's right to challenge *any* action by the trustees raises the danger of proliferation of wasteful lawsuits which the exclusivity rule avoids. Thus, in addition to the nature of the class, we think it necessary—in the case of potential beneficiaries—also to consider the nature of the challenge to the trustees' acts in deciding whether to apply the special interest exception.

In *Alco Gravure, supra,* the trustees of a foundation established to aid employees of the founder's corporations and their families decided, for tax reasons, to dissolve the foundation and transfer its assets to a kindred but tax-exempt foundation. In conferring standing to sue on employees of one of those corporations who were entitled to a preference in the distribution of the foundation's assets, the New York Court of Appeals observed that "the present action concerns not the ongoing administration of a charitable corporation, but the dissolution of that corporation and the complete elimination of the individual plaintiffs' status as preferred beneficiaries"; and thus, it concluded, the "policy reasons for limiting standing"—"to prevent vexatious litigation and suits by irresponsible parties who do not have a tangible stake in the matter"—did not apply. 64 N.Y.2d at 466, 490 N.Y. S.2d at 120, 479 N.E.2d at 765. In *Alco Gravure,* as noted, the trustees proposed

---

11. In its probate complaint, the Trustees asserted that only one of the House's current residents meets the original criteria of the Edes will. We also note that during the pendency of this litigation the original plaintiff, Virgie

Brown, has died, and we were informed at oral argument that the other, Elizabeth Ross, is no longer residing at Edes House because she has become ill.

615

an extraordinary measure threatening the existence of the trust, hence raising an issue that, by its nature, could only be tried once.

By contrast, where the challenge is to an ordinary exercise of discretion on a matter expressly committed to the trustees, recurring litigation is much more probable. For example, in *Kania v. Chatham, supra,* the appellate court denied standing to a student who had been nominated for a scholarship (but not selected by the trustees) to sue the trustees for abuse of discretion. 297 N.C. at 291–93, 254 S.E.2d at 530. The court emphasized the large size of the class of nominees for the scholarship, and recognized the danger that, if standing were conferred on this plaintiff, every spurned nominee (some 930 in number) could file an action challenging a decision committed to the trustees' discretion. The court was unwilling to allow rejected potential beneficiaries to clog court dockets and dissipate trust assets with attacks on ordinary exercises of trustees' judgment. In *Kania* also, unlike in *Alco Gravure,* the challenged exercise of discretion involved denial of a benefit to *an individual* and not the class as a whole. A suit by a representative of a class of potential beneficiaries should aim to vindicate the interests of the entire class and should be addressed to trustee action that impairs those interests, not the interests of a given individual.

### C. Application of the Exception to this Case

#### 1. Nature of the Class

Undeniably, Margaret Edes sought to confer the benefits of secure housing and companionship on a particular class of persons, creating an interest in its members distinct from that of the general public in the administration of those benefits. Nevertheless, we must decide whether the standards established in the Edes will, the charter, and the by-laws sufficiently narrow the class of potential beneficiaries. We conclude that they do.

The Trustees argue that the class of potential beneficiaries includes "all women" and so is limitless, because any woman could possibly become poor and widowed. They contend that "membership in the beneficiary class is not limited by threshold criteria as the beneficiary class was in *Alco Gravure.*" In that case, the court defined the class as "the employees of corporations in which [the settlor] was involved *and* the employees of successors of such corporations." 64 N.Y.2d at 466, 490 N.Y.S.2d at 120, 479 N.E.2d at 756 (emphasis added). We think there are definite criteria narrowing the instant class and identifying its present members with at least as much particularity as the limitation in *Alco Gravure.* The will and charter require the beneficiary to be (1) female, (2) indigent, (3) aged, and (4) widowed. The by-laws further require her (5) to "be in good health" (certifiably) and (6) to "have been for at least five years immediately preceding the date of application [a] resident[ ] of Georgetown" (although the Board has discretion to waive this requirement on unanimous vote).[12]

Moreover, the Trustees' own representations provide evidence that the class of potential beneficiaries is limited. Their reason for seeking the sale and transfer of the home was, according to the probate complaint, that "[i]n recent years, the number of applications from the group of beneficiaries specified in the Edes will, namely 'aged and indigent Widows residing, or to reside, within ... Georgetown' has decreased significantly," and that "[a]lthough the Trustees have actively sought to attract aged and indigent Georgetown widows, very few applications have been received from this group." At oral argument they cited as a partial reason for transfer-

---

12. Appellants all assert that they presently desire to live in the Edes House in its current Georgetown location. As the Edes will indicates that the Home was established for aged widows "residing or *to reside*" in Georgetown, and the by-laws allow the Trustees to waive the prior Georgetown residency requirement "in meritori-ous cases coming within the letter and spirit of the will and charter," appellants' longstanding periods of residence in the District of Columbia and present desire to live in Georgetown probably satisfy this requirement if facts are taken in a light most favorable to them.

ring the functions of the Edes Home to the Washington Home the difficulty of finding aged, indigent widows in sufficiently good health to satisfy the by-laws' requirement, and the unwillingness of otherwise eligible residents to risk living in a home where an illness requiring nursing care (which the Home does not provide) would result in expulsion.

### 2. Nature of the Challenged Action

Appellants argue vigorously that they are not alleging a simple abuse of discretion by the Trustees, and that the prospect of recurring vexatious litigation predicated on ordinary exercises of the Trustees' judgment is not present here. They argue that the Board here seeks to "change the face of Edes," effecting a transfer of functions that will change the Home's character fundamentally; indeed, if the Board is successful, no present or potential beneficiary will ever be able to reside in the Edes House in Georgetown—and this issue will only be litigated once.

The trial court responded that the Trustees do not seek to dissolve the trust or put its assets to a purpose different from that required by the will, charter and by-laws, but instead desire to relocate the functions of the Edes Home to the Washington Home so that the purposes of the Edes trust can continue to be fulfilled. According to the Trustees' probate complaint, the Edes Home will continue to exist as a corporate entity and to administer the trust assets, including the proceeds of the sale of the House, for the benefit of those residing in living units dedicated to the purposes of the Edes trust within the Washington Home.

It is beyond dispute that the proposed merger and transfer of functions to the Washington Home represent a major change from the manner in which the trust has been administered in the past. While the sale of trust property—including Edes House itself—is undoubtedly a matter within the Trustees' discretion, the intent of the Board in selling the House and the planned transfer of its functions to another entity raise substantial questions about the compatibility of this action with the settlor's intent; and these issues in turn distinguish the proposed action from an ordinary exercise of day-to-day discretion committed solely to the trustees' judgment. Moreover, the merger proposal places more at stake than just the loss of an opportunity to live at a certain address in Georgetown; it also portends the loss of Edes Home's independent identity, which may adversely affect the interests of all beneficiaries as a class.

As the Trustees acknowledge, they plan to transfer some of the Home's most important functions, including day-to-day maintenance and operation of the Edes living units and selection of residents, to the Washington Home. Notably, this latter function is one which the Edes charter reserves specifically to the Trustees. Although the Board alleges in the probate complaint that the corporation (and presumably the Board) will continue to exist and administer the trust, it is unclear exactly what the Trustees' duties will be.

The Trustees also acknowledge that Edes House in the past has provided relatively self-sufficient elderly individuals in good health a place in which to share the society of others like themselves.[13] Yet the proposed merger would place the functions of the Edes Home in a considerably different setting, a nursing home heretofore dedicated to care of the chronically ill and dying. At oral argument, the Trustees asserted that whether to provide medical and nursing care to Edes residents lies within their discretion, and that the historical limitation on eligibility to healthy individuals was a measure unrelated to Margaret Edes' intent. Without reaching the merits of this question, it is enough to note that the Trustees have operated Edes Home for some time under the assumption that limiting its housing opportunities to healthy

---

**13.** In their probate complaint, the Trustees asserted: "Because the Home is not licensed to provide any form of medical care and assistance and because the zoning of the facility does not permit such care or assistance in a facility of the Home's size, residents must be in good physical and mental health and ambulatory in order to use the Home's facilities."

widows was most consistent with the will and charter. Merger into a nursing home and hospice represents a basic change in the nature of the institution that at least raises an issue—on which we voice no opinion—whether the proposal is consistent with the settlor's will.

It is not an exaggeration, in other words, to say that the Trustees, and all present and future residents of the Edes Home, stand at a crossroads they are unlikely to face again. It may in fact be that the merger the Trustees propose is, as they contend, essential to preserving the trust in changed times—again, an issue not for us presently to decide. What is clear is that the outcome of this action will determine whether the institution undergoes the fundamental change the Trustees propose. When, as in *Kania*, the injury flows from an ordinary exercise of discretion by the trustees in the course of administering the trust—such as the selection among eligible recipients of a benefit—the need to prevent costly and recurring judicial intervention in decisionmaking justifies denial of standing to individual potential beneficiaries. But when, as here, the Trustees decide upon a basic change affecting the interests of the entire class of intended beneficiaries—and one alleged to be inconsistent with the settlor's will—the value of denying representatives of the class access to judicial process to challenge that decision is greatly diminished.

We conclude, therefore, that elderly, indigent widows satisfying the Trustees' own eligibility requirements have standing to challenge the actions proposed by the Board here, which may affect their "special interest" as a class in the continued administration of the Edes trust in a manner consistent with the will and charter. All such members have a present opportunity to enjoy a direct benefit differing markedly from the incidental and indirect benefit the public realizes from the housing of indigent elderly widows. Since the suit here is to vindicate a collective interest in the continued availability of that benefit—an interest affected by a proposed exercise of discretion that will change the nature of the institution—the prospect of recurrent, vexatious litigation is minimal.

It remains for us only to point out that undisputed record facts conclusively established appellant Mary Hooker's membership in the class of potential beneficiaries, and at least raised material issues of fact regarding Alice Ruddiman's and Willie Mae Stanley's membership. The trial court's grant of summary judgment was therefore improper. According to her affidavit submitted in opposition to the motion for summary judgment, Ms. Hooker is a 60–year-old widow in good physical and mental health who has resided in the District for 31 years, who now desires to live at Edes House, and whose annual income is $4,596. Ms. Ruddiman averred that she is a healthy 79–year-old, widowed lifelong resident of the District with a $16,000 annual income, and in their complaint appellants assert that Ms. Stanley is a widowed 74–year-old resident of the District of Columbia. While we cannot determine on this record whether Ms. Stanley is an eligible potential beneficiary, and venture no opinion as to whether Ms. Ruddiman's $16,000 income constitutes "indigency", these plaintiffs' status as elderly widows desiring to reside at Edes House alone raised a question of material fact as to their membership in the class Margaret Edes intended to benefit.[14] Since Ms. Hooker has standing to enforce the trust as a representative member of the class, however, it is unnecessary to remand for findings as to Ms. Stanley's and Ms. Ruddiman's eligibility, because the suit may proceed without them. The class has a representative in Ms. Hooker and a sufficiently distinct and tangible stake in the

---

14. The trial court concluded that "two of the plaintiffs—Alice Ruddiman and Marle Haentiens—not being widows, are ineligible for admission to the Edes Home." Because Ms. Haentiens admitted that she is not a widow, we agree with the trial court that she was not even a potential beneficiary, and lacked the requisite special interest in enforcement of the trust. However, in light of Ms. Ruddiman's averment in her affidavit that she is a widow, which the court is obliged to take as true on a motion for summary judgment, the trial court erred in concluding that she was ineligible on this ground.

outcome of this controversy to confer standing on its members. Accordingly,

*the judgment in No. 89–1316 is reversed;*[15] *the appeal in No. 89–1534 is dismissed as moot.*

---

**15.** Although we hold that Ms. Hooker has standing to enforce the trust as a representative of a limited, well-defined group of potential benefi- ciaries, we express no opinion as to whether other requirements for class certification have been satisfied. *See* Super.Ct.Civ.R. 23.