*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 23-CV-0832 & 24-CV-0045

PETER FARINA, APPELLANT,

V.

JANET KEENAN HOUSING CORPORATION, *et al*., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2022-CA-004492-B & 2023-CAB-006168)

(Hon. Juliet J. McKenna, Trial Judge)

(Argued October 8, 2024     Decided May 22, 2025)

*Peter Farina*, pro se.

*Stephen O. Hessler* for appellee Janet Keenan Housing Corporation.

*Lucy E. Pittman*, Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, and *Ashwin P. Phatak*, Principal Deputy Solicitor General, were on the brief, for appellee District of Columbia.

Before MCLEESE, DEAHL, and HOWARD, *Associate Judges*.

DEAHL, *Associate Judge*: Peter Farina has lived at the Victor Howell House, located at 1304 Euclid Street NW, since 1989.  At that time and for the next decade, the private owner of the property rented the house out to a group of low-income

individuals at reduced rates. When that private owner decided to sell the house in 2000, Farina and others advocated for the establishment of a non-profit charitable corporation known as the Janet Keenan Housing Corporation (JKHC), which then purchased the property partially through a grant provided by a national affordable housing nonprofit. The Victor Howell House is JKHC's only asset, and JKHC's articles of incorporation and bylaws identify its purposes as "preserv[ing] and promot[ing] affordable housing in the District."

These appeals stem from JKHC's recent attempts to sell the house to an undisclosed private third party, which triggered two tracks of litigation that are now consolidated before us. On the first track, the District sued JKHC to halt the sale on the basis that it was not compliant with JKHC's charitable purposes. As the District and JKHC neared a settlement that would permit the third-party sale to proceed, Farina sought to intervene to oppose the settlement, but the court denied that motion. Farina then appealed that ruling and separately brought his own second track of litigation, arguing that if the sale is permitted to proceed, he has a right to purchase the property himself as a protected tenant under the Tenant Opportunity to Purchase Act (TOPA). Farina also argued that JKHC's attempted sale would violate the Uniform Trust Code (UTC). The trial court ruled against Farina on both fronts. It reasoned that Farina's TOPA rights were extinguished by the court-approved settlement in the District's litigation. *See* D.C. Code § 42-3404.02(c)(2)(M)

(transfers "pursuant to . . . court-approved settlement[s]" are not "sales" triggering TOPA rights). It further reasoned that he lacked standing to bring his UTC claim, and in any event, that it had already rejected the arguments underlying Farina's UTC claim when it approved the proposed sale in the District's litigation.

Farina now appeals the rulings in both cases. He argues that the trial court erred by (1) denying his motion to intervene in the District's case, (2) denying him his TOPA rights, and (3) rejecting his UTC claim. We agree with Farina on his second point: The settlement between the District and JKHC, removing an impediment to JKHC's pre-litigation deal to sell the house to a third party, did not render the anticipated third-party sale exempt from TOPA's requirements. Farina must be afforded his rights, as an eligible tenant, to purchase the property prior to that third-party sale. We disagree with Farina on his first and third points: The trial court acted within its discretion in rejecting Farina's motion to intervene in the District's litigation and did not err in rejecting his UTC claim. We therefore affirm the trial court's judgment in the District's litigation, No. 23-CV-0832, but vacate its judgment in Farina's suit, No. 24-CV-0045, and remand that case for further proceedings.

# I. Factual Background

The facts in this case are not in dispute. Peter Farina has been a tenant at the Victor Howell House, a group home for low-income adults in need of affordable housing, for over thirty-five years. When a previous owner decided to sell the house some decades ago, Farina helped advocate for the creation of a non-profit corporation, JKHC, which purchased the property in 2000. JKHC funded its purchase of the house (its sole asset) through a conditional grant from the Enterprise Foundation, a national nonprofit that focuses on affordable housing issues. The grant required JKHC to maintain the house as "permanent rental housing" for low-income individuals who would operate it as a self-run household. Farina was named the "head of household" at the time of JKHC's 2000 purchase and has had various administrative and maintenance duties in that role. Farina also once served on JKHC's board of directors, but no longer does. As houses often do, this one eventually fell into some disrepair and JKHC claims it can no longer afford to maintain the house.

In 2022, JKHC's president and CEO informed Farina and the other residents that JKHC was putting the house up for sale. When the residents asked if they would be permitted to stay in the house, they were told that it would be up to the new owner. That news triggered two different lawsuits. In the first lawsuit and at Farina's

urging, the District sued JKHC to block the sale of the house on the grounds that the sale would violate JKHC's charitable mission. When the District and JKHC neared a settlement that would allow the sale to proceed, and Farina was denied leave to intervene, Farina brought his own suit alleging that the anticipated sale would violate his TOPA rights and the UTC. We detail these separate suits in turn.

*District of Columbia v. JKHC*

When Farina learned that JKHC was intent on selling the Victor Howell House, he contacted District government authorities in September 2022 to alert them. The District promptly responded by sending JKHC a "standstill letter," directing it to cease efforts to sell the house. When JKHC nonetheless went under contract to sell the house with a closing date scheduled for early October 2022, (1) Farina responded by filing an official form with the District invoking his TOPA rights, and (2) the District responded by filing suit to enjoin the sale. The District argued in its suit that the sale would violate the Non-Profit Corporation Act because it would run contrary to JKHC's charitable purposes. *See generally* D.C. Code § 29-410.03 ("Property held in trust or otherwise dedicated to a charitable purpose shall not be diverted from its purpose."). The trial court granted the District's motion to enjoin the sale and precluded JKHC from selling the property until further order of the court.

After nearly a year of litigation, as the District and JKHC were on the cusp of reaching a settlement agreement, Farina moved to intervene in the case. He argued that he should be permitted to intervene as of right because his "beneficial interest . . . in residing affordably" at the house would be harmed by the impending settlement agreement that would permit the sale to proceed. JKHC and the District both opposed that motion, informing the court that the parties had reached an agreement in principle and arguing, among other things, that Farina's intervention was untimely. Farina did not raise the protection of his TOPA rights as a basis to permit his intervention in his motion to intervene. But he briefly alluded to it in his reply supporting that motion, which said that Farina had "yet to be served with any paperwork required under the District's Landlord Tenant Laws," in apparent reference to his TOPA rights.

The trial court denied Farina's motion to intervene the same day he filed his reply—apparently some hours beforehand—reasoning in part that (1) his motion was untimely given that the parties had already reached a "settlement in principle," (2) his motion failed to comply with the requirement that intervention motions "be accompanied by a pleading that sets out the claim . . . for which intervention is sought," Super. Ct. Civ. R. 24(c), and (3) Farina failed to establish that he had standing to intervene. The order did not comment on Farina's or other tenants' TOPA rights or the effect the settlement agreement might have on them.

The District and JKHC then filed a joint motion requesting that the trial court approve their settlement agreement the following month. The terms of the settlement agreement were as follows: (1) JKHC was permitted to proceed with the pending sale to the third-party buyer; (2) if the sale went through, JKHC would use the proceeds first to satisfy its outstanding debts, then transfer the remaining proceeds to Volunteers of America Chesapeake and Carolinas (VOACC), an affordable housing non-profit corporation; (3) JKHC and VOACC would further enter into a separate agreement under which VOACC would allocate a portion of the proceeds to relocate the current residents to a VOACC property in the District, if the residents desired, where VOACC would offer the same rent to the tenants paid at the Victor Howell House for at least one year; (4) the remaining proceeds would be allocated to VOACC's "District affordable housing programming"; and (5) if "for any reason" the contract with the third-party buyer fell through, JKHC could find another purchaser but first had to give the District "an opportunity to be heard on the proposed transaction."

The trial court approved the settlement agreement after concluding that it comported with JKHC's charitable purposes. The court also lifted the injunction that had precluded JKHC from selling the house, and Farina appealed.

*Farina v. JKHC*

As the District's litigation wrapped up, Farina brought his own suit. He raised two principal claims in support of his request to enjoin the impending sale of the Victor Howell House to a third party: (1) that if the proposed sale were permitted to proceed, it would violate his TOPA rights because as a tenant he had "a right to match the current contract price" but had not been afforded the opportunity to do so despite his invocation of his TOPA rights, and (2) that the proposed sale would breach the UTC, which like the Non-Profit Corporation Act requires that trust assets be used in a manner compliant with the entity's purposes. *See generally* D.C. Code § 19-1304.09. While JKHC was formally established as a non-profit corporation rather than a trust, Farina argued that the UTC applied to JKHC because it was effectively a charitable trust and that rules governing trusts apply to non-profit corporations like JKHC in any event.

The trial court granted judgment as a matter of law to JKHC. As to Farina's TOPA claim, the court reasoned that Farina's TOPA rights were obviated by the court-approved settlement agreement in the District's litigation, which brought the proposed third-party transfer outside of TOPA's definition of what constitutes a "sale." For that conclusion the court relied on D.C. Code § 42-3404.02(c)(2)(M),

which says that any "transfer pursuant to court order or court-approved settlement" is not a "sale" that triggers TOPA rights.

The trial court also found that Farina lacked standing to bring a UTC claim, and that even if he did have standing, the proposed sale was consistent with JKHC's charitable purposes as the court had determined in the District's litigation. The court explained that the UTC specifically contemplates that a court "may apply *cy pres* to modify . . . the trust by directing that the trust property be applied or distributed . . . in a manner consistent with the settlor's charitable purposes," D.C. Code § 19-1304.13(3), as the court had done through its approval of the settlement in the District's case.

Farina now appeals and the two cases have been consolidated on appeal.

## II. Analysis

Farina contends that the trial court erred by (1) denying his motion to intervene in the District's case, (2) concluding that the court-approved settlement in the District's case extinguished his TOPA rights, and (3) ruling that he did not have standing to raise his UTC claim. We address those arguments in turn.

*A. The trial court did not err in denying intervention.*

Farina first argues that the trial court erred when it denied his motion to intervene in the District's litigation. We disagree.

A motion to intervene must be "timely," "state the grounds for intervention," and "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Super. Ct. Civ. R. 24. The trial court cited several procedural and substantive defects as grounds for denying Farina's motion to intervene, but we need not sort through all of them because its ruling that the motion was "patently untimely" is reason enough to uphold the trial court's ruling.

The trial court has "discretion in determining" whether a motion to intervene is untimely and would cause undue prejudice to the existing parties. *McPherson v. D.C. Hous. Auth.*, 833 A.2d 991, 994 (D.C. 2003) (quoting *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 125 n.36 (D.C. Cir. 1972)); *Mokhiber v. Davis*, 537 A.2d 1100, 1104 (D.C. 1988). In determining whether a motion to intervene is timely, "the trial court . . . consider[s] a number of factors: (1) the time that has passed since the applicant knew or should have known of his or her interest in the suit; (2) the reason for the delay; (3) the stage to which the litigation has progressed; and (4) the prejudice the original parties would suffer from granting intervention and the applicant would suffer from denial." *Mokhiber*, 537 A.2d at 1104.

Each of those factors supports the trial court's denial of intervention here. First, Farina was aware of the District's litigation at its inception, in September 2022, but he waited ten months before seeking to intervene, presumably because he was content to leave the District to litigate the matter. Second, Farina did not articulate any justification for his delayed attempt to intervene in the case except for his dissatisfaction with the District's anticipated decision to settle the matter. Third, the litigation had proceeded to the cusp of a settlement, so that permitting intervention would have thwarted an apparent resolution of the case. And fourth, both the District and JKHC would have been seriously prejudiced by Farina's late intervention, which would have scuttled their considerable and near-completed efforts to reach an amicable resolution of the case.

It is important to our analysis, as we discuss further in the next section, that the proposed settlement in the District's litigation did not extinguish Farina's TOPA rights. The District in fact made its view quite clear that nothing in the settlement agreement interfered with Farina's TOPA rights. If the settlement had in fact extinguished Farina's TOPA rights, we might reach a different conclusion about the timeliness of Farina's motion to intervene. That is because we doubt Farina had any meaningful notice, prior to his attempt to intervene, that his TOPA rights might be extinguished via the District's litigation. And if Farina's TOPA rights were in fact extinguished by the settlement in the District's case, the prejudice Farina would

suffer from the denial of intervention would be severe, perhaps tilting the balance in favor of permitting his intervention. But as we now explain, the settlement in the District's case did not extinguish Farina's TOPA rights, so his motion to intervene was properly denied.

### B. Farina's TOPA rights remain intact.

That brings us to Farina's TOPA rights. Farina argues that under TOPA, he retains a statutory right to match the terms of the third-party offer to buy the Victor Howell House. The trial court concluded otherwise, reasoning that the anticipated property transfer was not a "sale" under TOPA because it is a "transfer pursuant to court order or court-approved settlement," D.C. Code § 42-3404.02(c)(2)(M), to wit, the court-approved settlement agreement in the District's litigation.

This issue presents a question of statutory interpretation, which we review de novo. *Czajka v. Holt Graphic Arts, Inc.*, 310 A.3d 1051, 1053 (D.C. 2024) (en banc).

As an overview, TOPA generally provides that where an owner decides to sell a housing accommodation, eligible tenants like Farina shall have the first opportunity to purchase it "at a price and terms that represent a bona fide offer of sale." D.C. Code § 42-3404.02(a). Where the seller already has a contract of sale with a third-party purchaser, as here, eligible tenants have a right to "match the terms

of a third-party offer that the seller had agreed to accept." *Lane v. D.C. Dep't of Hous. & Cmty. Dev.*, 320 A.3d 1044, 1046 (D.C. 2024) (citing D.C. Code § 42-3404.02(a-2)(1)(B)(i)); *see also* D.C. Code § 42-3404.08 (right of first refusal). JKHC does not contest that Farina is an eligible tenant under TOPA. D.C. Code § 42-3404.09(c)(1) (tenants in a single-family accommodation who are elderly or disabled are eligible tenants under TOPA).

Critical to our analysis is that an eligible tenant's right to purchase under TOPA is predicated on a "sale," a term that TOPA exhaustively defines in D.C. Code § 42-3404.02. A classic sale is one where an owner agrees to transfer "a housing accommodation . . . [f]or a price and other material terms . . . in an arm's length third-party contract." *Id.* § 42-3404.02(a-2)(1)(B)(i). In this case, JKHC admits that its contract to sell the house is a "third-party arm's length contract," so that it seems to satisfy TOPA's core definition of a sale. Sales also include less standard transactions, such as certain "master lease[s]" and some "transfer[s] of . . . ownership interest[s] in a corporation" or other entity "which owns an accommodation as its sole or principal asset." *Id.* § 42-3404.02(c)(1)(A), (B).

But TOPA also lists a litany of property transfers that do not qualify as sales under the statute. *Id.* § 42-3404.02(c)(2). Those exemptions include, for instance, "inter-vivos transfer[s]" between certain family members, foreclosure sales, tax

sales, bankruptcy sales, certain transfers to named beneficiaries of revocable trusts, and transfers effectuated through eminent domain. *Id.* § 42-3404.02(c)(2)(B), (C), (D), (E), (K), (N). The recurring theme throughout these exemptions is that, with at least one exception, they generally contemplate transfers that are not the result of "arm's-length" transactions between a buyer and a seller so that the transfer falls outside of TOPA's core definition of what constitutes a sale.[1] *See, e.g.*, *Ballard v. Newton Cnty. Bd. of Tax Assessors*, 773 S.E.2d 780, 782 (Ga. Ct. App. 2015) ("Foreclosure sales . . . are forced sales conducted under conditions that differ from the ordinary market for the property in question, and notoriously fail to bring the true market price of the property." (citations omitted)); *id.* at 783 (same as to "tax sale[s]"). That is, the exempted transactions are generally not between unaffiliated parties that are willing sellers and buyers with "roughly equal bargaining power," and thus they generally do not result in sales at a fair market price. *See* Black's Law Dictionary, *Arm's Length* (12th ed. 2024).

---

[1] One more peculiar exemption is (H-i), which consists of about thirty subsections detailing when conveyances of "The Woodward Building" at "733 15th Street N.W." will not be deemed a sale. But by and large, the exemptions target transfers that do not result from arm's-length sales, but are instead transfers between affiliated parties or are the result of compulsory and involuntary sales, as with tax, bankruptcy, and court-ordered sales.

Turning to the relevant exemption in this case, section 42-3404.02(c)(2)(M) provides that "[a] transfer pursuant to [a] court order or court-approved settlement" does not qualify as a sale under TOPA. On one view, which JKHC advances and the trial court endorsed, its anticipated sale to a third-party buyer is pursuant to a "court-approved" settlement because JKHC's settlement with the District permits the third-party sale to proceed. That settlement states that "JKHC is permitted to fulfill the terms and obligations provided in the [third-party] Contract" of sale, and one might naturally say that any sale compliant with that settlement is made "pursuant to" it.

But the matter is not free from ambiguity. Recall that the third-party contract in this case was entered into before the District sought to enjoin the sale, and the terms of that contemplated sale were not arrived at through litigation or even articulated in the court-approved settlement. Instead, the settlement merely resolved the District's challenges to the sale and directed how the proceeds of the third-party sale would be distributed. So it is at least arguably more natural to say that JKHC is seeking to complete a transfer pursuant to a third-party contract, not pursuant to the court-approved settlement which simply allowed the contracted-for sale to proceed. As some further support for this view, the settlement agreement provides that the "[s]ale of the Property *may* proceed pursuant to the Contract *and applicable law*" (emphases added), with no indication that the settlement agreement superseded

JKHC's other legal obligations, such as those that JKHC owed to Farina and any other eligible tenants under TOPA. The District in fact made its position clear that it did not intend to obviate Farina's or any other tenant's TOPA rights by settling its case. The District posited before the trial court that "[n]othing in the Parties' [settlement agreement] interferes with the rights of the residents of the Property, and [Farina] would still have all the process afforded to him under landlord-tenant law," and "the District never intended for the [settlement agreement] to interfere with any tenant's TOPA rights."

We ultimately agree with Farina that the better view is that JKHC's proposed transfer here is a classic "sale" pursuant to an arm's-length third-party contract under TOPA, rather than an exempted transfer pursuant to a court order or court-approved settlement agreement under section 42-3404.02(c)(2)(M). The (c)(2)(M) exemption cannot sensibly be read to apply where a court order or settlement merely removes an obstacle to an arm's-length sale with a third party. Because the terms of the sale here were reached by way of "arms' length dealing between an owner willing (but not forced) to sell, and a buyer willing (but not forced) to buy," it reflects "a sale in the open market," and Farina retains his TOPA rights to match the terms of that sale. *Wallasey Tenants Ass'n v. Varner*, 892 A.2d 1135, 1141 (D.C. 2006) (citation omitted).

We are aided in our conclusion by two complementary principles of statutory construction. The first is our obligation to construe TOPA "liberal[ly]," *Richman Towers Tenants' Ass'n, Inc. v. Richman Towers LLC*, 17 A.3d 590, 598 (D.C. 2011), and to "resol[ve] . . . ambiguity . . . toward the end of strengthening the legal rights of tenants," D.C. Code § 42-3405.11. Where a settlement agreement merely removes an impediment to a third-party sale, it would run contrary to TOPA's purposes to permit such a settlement to extinguish non-parties' TOPA rights to match the terms of a sale arrived at prior to litigation.

The second and more compelling interpretive principle is that we are obliged to avoid absurd statutory constructions. *Cardozo v. United States*, 315 A.3d 658, 672 (D.C. 2024) (en banc). JKHC and the trial court's interpretation of the (c)(2)(M) exemption would sow intolerable absurdity into TOPA. Namely, any court order approving a sale in seeming violation of a tenant's TOPA rights would be immune from challenge—the court order would bootstrap itself into TOPA compliance because the transfer would satisfy the (c)(2)(M) exemption and thus not be a TOPA "sale." That cannot possibly be right. We have fairly routinely reversed court-ordered or -approved transfers because they violated a tenant's TOPA rights. *See, e.g.*, *Bowyer v. Reinhardt*, 277 A.3d 1259, 1261 (D.C. 2022) (reversing court order directing trustee "to convey the Property to Reinhardt," concluding that the tenants' assignee "alone is entitled to purchase the Property"); *1305 Rhode Island*

*Ave. NW, LLC v. Mussells*, 292 A.3d 212, 214-15 (D.C. 2022) (reversing court order approving a sale "pursuant to the Mussells Contract" and directing a sale to the tenants' assignee instead). If the (c)(2)(M) exemption were as broad as JKHC posits, we were wrong in each of those cases, because the challenged court orders perforce brought the transfers under the (c)(2)(M) exemption and outside of what constitutes a sale under TOPA.

To further illustrate the point, consider if a different tenant of the Victor Howell House had invoked their TOPA rights to purchase the house but eventually reached a court-approved settlement permitting JKHC to move forward with a third-party sale, perhaps for no other reason than that the tenant was no longer interested in purchasing it. On JKHC's reading of the statute, such a settlement could extinguish the rights of all remaining tenants even when those rights were not considered by the court approving the settlement—a plain absurdity. More absurdly still, under JKHC's interpretation, the owner of a housing accommodation (or anybody friendly to their cause) could manufacture a suit for the purpose of ultimately settling it and thereby skirting its TOPA obligations. We have previously warned against interpreting section 42-3404.02(c)(2)(M) in a manner that would

invite such "disingenuous lawsuits" that seek to "evade . . . TOPA obligations" by way of subsequent settlements. *Juul v. Rawlings*, 153 A.3d 749, 755 (D.C. 2017).[2]

The (c)(2)(M) exemption cannot sensibly be read so broadly as to permit any court-approved sale to be immune from a TOPA challenge; it requires some cabining principle. One ready limiting principle, which we adopt and is sufficient to resolve this case, is that the (c)(2)(M) exemption does not apply where the terms of a proposed sale were arrived at entirely outside of litigation, so that the court order or settlement at issue merely approved an arm's length third-party sale that fits within the core definition of a sale under TOPA.

We are further bolstered in this conclusion by the only previous precedent of this court interpreting the (c)(2)(M) exemption, *Juul v. Rawlings*, *id.* That case involved litigation between co-owners of a home—Mr. Juul and Ms. Rawlings— where Ms. Rawlings sued to force a partition sale of the home after the couple's romantic relationship ended. *Id.* at 752. Ms. Rawlings also sought substantial damages related to loans she had taken out to renovate the home and keep it out of foreclosure. *Id.* The parties eventually settled their dispute through an agreement that, among other things, (1) permitted Ms. Rawlings's mother to "submit a contract

---

[2] The District's suit in this case clearly did not involve such a subterfuge, as it is apparent that the District never had any intention of obviating any tenant's TOPA rights when it agreed to settle its suit.

to purchase the property at a price of $455,000," and (2) dismissed with prejudice Ms. Rawlings's claim for damages. *Id.* When Ms. Rawlings's mother sought to purchase the house at the court-approved price, Mr. Juul's mother—who had procured the tenants' TOPA rights via assignment after the court-approved settlement—intervened in the case and invoked those TOPA rights to match the purchase price. Ms. Rawlings responded "that she would not have entered into the settlement" but for its guarantee that her mother could purchase the home at the agreed upon price, and the trial court enforced the settlement agreement. *Id.* at 753-54. On those facts—where (1) the purchase price for the home and the particular purchaser were material and bargained-for terms reached amidst litigation in exchange for surrendering other legal claims, rather than the result of an arm's-length transaction, and (2) Mr. Juul's and his mother's actions seemed designed to "intentionally frustrate the purpose of a settlement agreement procured through litigation," *id.* at 758—we held that the court-approved transfer was not a sale so that the (c)(2)(M) exemption applied to obviate Ms. Juul's TOPA rights. *Id.* at 752.

The critical difference between *Juul* and this case is that, here, the contracted-for sale preceded any litigation and was not the byproduct of an exchange of legal claims in reaching the sale's terms. That stands in stark contrast to cases like *Juul,* where a court-approved settlement sets a purchase price and other terms of sale so that the transfers cannot be deemed arm's-length transactions and there is

little reason to think the court-approved purchase price reflected the home's fair market value—it was a sweetheart deal for Ms. Rawlings's mother. *Wallasey*, 892 A.2d at 1140 (explaining that TOPA generally does not apply where "financial aspects of the transaction were agreed upon without relation to the fair market value of the property conveyed"). In *Juul*, the purchase price was instead the byproduct of extensive litigation and arrived at in exchange for the surrender of legal claims. To have allowed Mr. Juul's mother to purchase the home at a price that Ms. Rawlings had agreed to only in exchange for surrendering her legal claims, and only on the condition that *her* mother be permitted to purchase it at that presumably depressed price, would have provided a windfall to Mr. Juul's mother and would have disincentivized Ms. Rawlings from settling her suit. *Juul*, 153 A.3d at 755 (stressing that the (c)(2)(M) exemption is animated by the "important policy" of "encourag[ing]" litigation settlements). It also would have rewarded what appeared to be the Juuls' intentional machinations to subvert the settlement.

Whereas here, Farina asks only for his opportunity to match the purchase price reached through an arm's-length pre-litigation agreement with a third-party prospective buyer, and affording Farina that statutory right would have had no obvious bearing on JKHC's and the District's incentives to settle the suit between them (concerning JKHC's disposition of proceeds from any such sale). And recognizing Farina's TOPA rights would not meaningfully interfere with the

settlement between JKHC and the District, which again, principally concerned how the proceeds of any sale would be allocated.

Because JKHC proposes to sell this house to a third-party purchaser at a price agreed upon through an arm's-length pre-litigation deal, and not on terms directed by a court order or court-approved settlement, this is a sale covered by TOPA's terms, not an exempted transfer under the (c)(2)(M) exemption. Farina thus retains his TOPA rights.

### C. Farina lacks standing to bring his Uniform Trust Code claim.

Finally, Farina argues that JKHC's proposed sale of the house would violate the Uniform Trust Code because permitting any sale to go forward would violate the JKHC's purposes as a charitable trust. The District has adopted the UTC. *See* D.C. Code §§ 19-1301 to -1311. The trial court, assuming that the UTC applies to JKHC, rejected Farina's challenge for two main reasons: (1) Farina did not have standing to raise a UTC claim, and (2) his challenges had already been resolved in the District's litigation, where the "Court previously approved the sale of the property and distribution of assets" after finding that doing so would not violate JKHC's charitable purposes. The parties address only the first basis for the trial court's ruling in their briefs, and we will similarly limit ourselves to that issue.

"Whether appellants have standing is a question of law which we consider on appeal de novo," while reviewing any "underlying factual determinations under the clearly erroneous standard." *Bd. of Dirs, Wash. City Orphan Asylum v. Bd. of Trs.*, 798 A.2d 1068, 1074 (D.C. 2002). The plaintiff, Farina in this case, "bears the burden to establish standing." *UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 43 (D.C. 2015). Like the trial court, we will assume that the UTC applies to JKHC, which is formally a non-profit corporation rather than a trust. *Family Fed. for World Peace v. Moon*, 129 A.3d 234, 244 n.15 (D.C. 2015) ("[W]e have recognized the applicability of the rules relating to charitable trusts to [charitable] corporations.").

Farina's principal argument for why he has standing to bring his UTC claim is that he's a "settlor" of JKHC. *See* D.C. Code § 19-1304.05(c) ("The settlor of a charitable trust . . . may maintain a proceeding to enforce the trust."). A settlor is a legal term used to refer to "a person . . . who creates, or contributes property to, a trust." D.C. Code § 19-1301.03(16); *see also* Restatement (Third) of Trusts § 3(1) (Am. L. Inst. 2024) ("The person who creates a trust is the settlor."). Farina is not a settlor for the simple reason that he did not contribute any property to JKHC—the Enterprise Foundation provided the seed money to JKHC to fund the Victor Howell House's purchase. Under the Uniform Trust Code, a settlor generally must contribute assets, such as funds or property, to create a trust. *See* Unif. Trust Code

§ 103 cmt. (2023) (explaining that it is generally not difficult to determine "the identity of the 'settlor'" because "[t]he same person will both sign the trust instrument and fund the trust"); *id.* (if "the person who executes the trust instrument [is] acting as the agent for the person who will be funding the trust[,] . . . the person funding the trust" is the settlor); Restatement (Third) of Trusts pt. 2, ch. 3, intro. Note (Am. L. Inst. 2024) ("In order to create a trust, . . . the settlor ordinarily must make an effective inter vivos or testamentary transfer of the trust property to the trustee.").[3]  It does not apply to those like Farina, who merely advocated for a trust's creation, and who briefly and formerly served on JKHC's board of directors.  While there may be exceptions to the rule that a settlor must contribute trust assets, Farina does not identify any plausible sense in which he might be considered a settlor of JKHC.

Farina alternatively argues that he is a "special interest" beneficiary of the trust, who we have recognized might also maintain a suit.  *Hooker v. Edes Home*, 579 A.2d 608, 612 (D.C. 1990) ("a clearly identified intended beneficiary has a justiciable interest in enforcement of the trust" (citing Restatement (Second) of

---

[3] While these comments to the UTC are not part of the D.C. Code, they are persuasive authority that we have previously looked to as "helpful" in interpreting the related code provisions, and we likewise look "to the Restatement's provisions" as persuasive authority. *In re D.M.B.*, 979 A.2d 15, 24 n.8 (D.C. 2009).

Trusts § 391, cmt. C (Am. L. Inst. 1959))). "[A] particular class of potential beneficiaries has a special interest in enforcing a trust if the class is sharply defined and its members are limited in number,"[4] which is determined principally by examining the trust's organizing documents, such as its bylaws, charter, and articles of incorporation. *Id.* at 614-15 (deciding "whether the standards established in the . . . will, the charter, and the by-laws sufficiently narrow the class of potential beneficiaries"); *see also Bd. of Dirs., Wash. City Orphan Asylum*, 798 A.2d at 1074-75 (examining governing documents in relation to whether trust was set up for narrow class of special interests).

This argument fails, too. In *Hooker*, we held that a plaintiff had special interest standing where a trust was specifically established to benefit "very few" individuals, namely, those who were (1) female, (2) indigent, (3) aged, (4) widowed, (5) in good health, and (6) residents of Georgetown for at least the five preceding years. 579 A.2d at 615. The plaintiff checked each of those discrete boxes so we determined she had special interest standing. *Id.* at 617.

---

[4] To maintain special interest standing, the narrow class of beneficiaries must also show there is "an extraordinary measure threatening the existence of the trust." *Hooker*, 579 A.2d at 615-16. We assume, for the sake of argument, that this condition of special interest standing is satisfied here.

Contrast that with JKHC's purposes, set forth in its articles of incorporation and bylaws, which do not identify any limited or sharply defined class of persons entitled to benefit from its work. JKHC's purposes are instead quite broad, in that it must act to "preserve and promote affordable housing in the District." To accept Farina's argument would require us to say that every individual who benefits from affordable housing in the District would have standing to bring suit against JKHC under the UTC. That is an untenably broad class that "would be uncertain and limitless," as we concluded in *Williams v. Bd. of Trs. of Mount Jezreel Baptist Church*, 589 A.2d 901, 909 (D.C. 1991). In *Williams*, we held that ousted members of a church did not have the requisite "special interest" to sue the church for violation of its trust simply because of their "regular church attendance and financial contributions." *Id.* And this case is far closer to *Williams*—where the relevant class is undefined and limitless—than it is to *Hooker*, which involved a far narrower special interest class.[5]

---

[5] The general rule is that "only a public officer, usually the state" or the District's "Attorney General, has standing to bring an action to enforce the terms of the trust." *Hooker*, 579 A.2d at 612. While there are both statutory and common law exceptions to that rule in the District, we note that where the District has in fact brought and settled a suit to enforce the trust, that would seem to counsel against giving others special interest standing to re-litigate the matter. No party has raised that point—and perhaps it sounds only in collateral estoppel principles rather than standing—so we do not opine upon it further.

We agree with the trial court that Farina lacked standing to bring his UTC claim.

### III. Conclusion

The judgment in the District's suit, No. 23-CV-0832, is affirmed. The judgment in Farina's suit, No. 24-CV-0045, is vacated and we remand the case for further proceedings so that Farina can be afforded his TOPA rights.

*So ordered.*