NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

7th Circuit Court-Dover Probate Division
No. 2018-0309

IN RE TRUST OF MARY BAKER EDDY

Argued:  February 14, 2019
Opinion Issued:  June 14, 2019

Pierce Atwood LLP, of Portsmouth (Michele E. Kenney on the brief), DLA Piper LLP, of Wilmington, Delaware (Stuart Brown on the brief and orally), and Foehl & Eyre, PC, of Glenside, Pennsylvania (Robert B. Eyre on the brief), for the Second Church of Christ, Scientist, Melbourne (Australia).

Upton & Hatfield, LLP, of Concord (Russell F. Hilliard, James F. Raymond, and Michael P. Courtney on the brief, and Mr. Hilliard orally), for the Trustees of the Clause VI Trust and Clause VIII Trust.

Gordon J. MacDonald, attorney general (Thomas J. Donovan, director of charitable trusts, and Charles D. Shockley, assistant director of charitable trusts, on the brief, and Mr. Donovan orally), for the Attorney General, Director of Charitable Trusts.

DONOVAN, J.  The Second Church of Christ, Scientist, Melbourne (Australia) appeals an order of the Circuit Court (King, J.), denying it standing

to request affirmative relief and enforce certain charitable trusts created by the will of Mary Baker Eddy.  We affirm.

I. Factual and Procedural Background

The relevant facts follow.  Mary Baker Eddy founded the Church of Christian Science and, upon her death in 1910, her will established two testamentary trusts, known as the Clause VI Trust and Clause VIII Trust.  The Clause VI Trust bequeathed to the "Christian Science Board of Directors of The Mother Church" $100,000 in trust "for the purpose of providing free instruction for indigent, well educated, worthy Christian Scientists."  Clause VIII of Mrs. Eddy's will devised "all the rest, residue and remainder of [her] estate . . . to The Mother Church — The First Church of Christ, Scientist, in Boston, Massachusetts, in trust," for certain "general purposes."  She directed, inter alia, that "such portion of the income of [her] residuary estate as may be necessary shall be used for the purpose of keeping in repair the church building" and her former home in Boston and that "the balance of said income, and such portion of the principal as may be deemed wise," shall be used "for the purpose of more effectually promoting and extending the religion of Christian Science as taught by [Mrs. Eddy]."

In previous litigation concerning these trusts, we upheld the validity of the trusts and established that the bequest in Clause VIII was to be held in trust for two purposes, church building repair and "promoting and extending the religion of Christian Science as taught by [Mrs. Eddy]."  Glover v. Baker, 76 N.H. 393, 400-01 (1912); see also Fernald v. Church, 77 N.H. 108, 109 (1913).  The Massachusetts Supreme Judicial Court reached a similar conclusion in Chase v. Dickey, 99 N.E. 410 (Mass. 1912), wherein the court held that the construction of the Clause VIII Trust manifests a purpose to make the promotion and extension of the religion of Christian Science the "dominating and real residuary purpose" of Mrs. Eddy.  Chase, 99 N.E. at 415.  As a result of this litigation, court oversight of the trusts commenced, and annual accounts for both trusts, and requests for appointments of trustees, have been filed in the Concord Probate Court (now, Circuit Court) for over one hundred years.

The trustees of the Clause VIII Trust were comprised of the Board of Directors of the Mother Church and Josiah Fernald, the administrator of Mrs. Eddy's estate, until Mr. Fernald's death in 1949.  At that time, Judge Lord of the probate court, in a letter to the trustees, concluded that it was "not necessary to fill the vacancy [of Mr. Fernald]" and that the "five members of the Christian Science Board of Directors who are the surviving trustees . . . shall constitute the sole trustees" of the Clause VIII Trust.  Since the 1949 letter, the trustees of the Clause VIII Trust have all been members of the Mother Church Board of Directors.

2

In 1993, following an investigation by the New Hampshire Director of Charitable Trusts (DCT) into a five million dollar loan from the Clause VIII Trust to the Mother Church to be used to fund a failed television venture, the Probate Court (Cushing, J.) approved a stipulation between the DCT and the trustees of the Clause VIII Trust. The stipulation provided, inter alia, that: (1) the Mother Church agreed to repay the loan to the Clause VIII Trust; (2) the Clause VIII Trust income was to be used to repair the church, with any available, remaining income to be applied to the promotion and extension of Christian Science, at the discretion of the trustees; (3) further loans from the trust were prohibited; and (4) the principal of the Clause VIII Trust could only be invaded with court approval.

The current litigation commenced in 2015, when Second Church, an alleged qualified beneficiary of the Clause VIII Trust, sought to review, and potentially object to, the annual accounting filed by the trustees. Although the DCT assented to Second Church's motion, the trustees objected on the basis that Second Church, as a "branch church," lacked standing to sue. Second Church responded by arguing that it had standing under the special interest doctrine. The court scheduled a hearing to address the issue of standing. However, the court did not rule on Second Church's motion or the standing issue because the parties agreed at the hearing that Second Church would withdraw its motion and the DCT, Second Church, and the trustees would cooperate to resolve concerns raised by Second Church and the DCT.

Notably, prior to the court's scheduling order, the DCT had not responded to the concerns voiced by Second Church. Thereafter, the DCT filed a memorandum in April 2016 asserting that Second Church did not have special interest standing, especially in light of the DCT's "plan to review the Clause VIII Trust's decision making concerning its distributions." In his memorandum, the DCT recognized that prior litigation had arisen from the "tension" between the two beneficial purposes of the Clause VIII Trust, namely: (1) repair of the Mother Church building(s); and (2) "promoting and extending the religion of Christian Science." The DCT also acknowledged the tension between the 1912 decision in Chase, 99 N.E. at 415, that devoted the Clause VIII Trust distributions primarily to promoting and extending the religion of Christian Science, and the court's approval of the 1993 stipulation prioritizing distributions for church repairs. The DCT further opined that "[b]ecause the trustees of the Clause VIII Trust are also the Board of Directors of the Mother Church, they have embedded conflicting fiduciary obligations." In light of these concerns, the DCT outlined a review plan that he intended to undertake with the trustees, which included a "review [of] the distributions made from the Clause VIII [Trust]." The DCT concluded that because his office had, and continued to take, an active role in monitoring the Clause VIII Trust, "special interest standing is not warranted."

3

Thereafter, following the DCT's objection to the trustees' accounts filed in 2016, the DCT and trustees reached an agreement and the trustees filed a motion, assented-to by the DCT, to, among other things, approve an amended account. Second Church moved for authorization to file an amicus curiae brief voicing its continuing concerns. The trial court issued an order requiring the trustees to file accounts audited by an independent auditor. The court also denied Second Church's motion, but indicated that Second Church should share information with the DCT who, by statute, represents their interests in this matter. See RSA 564-B:4-405(c) (2007).

Subsequently, the trustees submitted an assented-to motion to, inter alia, amend the 1993 order. Second Church, again, sought to submit a brief as amicus curiae. The trustees objected. Second Church filed a responsive pleading as well as a status report and a request for time to conduct discovery, despite the fact that its standing to participate in this matter had not yet been determined. The court scheduled a hearing for November 2017. Prior to the hearing, the trustees filed a memorandum concerning the issue of standing. Second Church responded by moving for the appointment of an independent trustee and filing a memorandum on standing.

In March 2018, the trial court issued an order finding that Second Church failed to satisfy its burden to demonstrate that it had standing. We note that in making this determination, the trial court did not identify the standard by which it decided the standing issue — i.e., whether the trial court considered the challenge to Second Church's standing as a motion to dismiss.

In its order, the trial court acknowledged the general rule that when a trust is determined to be charitable, it becomes the duty of the attorney general to ensure that the rights of the public in the trust are protected and that the trust is properly executed. See Petition of Burnham, 74 N.H. 492, 494 (1908). The court further noted that New Hampshire law is unclear as to whether a possible beneficiary of a charitable trust, like Second Church here, has standing. Looking to other jurisdictions for guidance, the trial court determined that most jurisdictions have ruled that a possible beneficiary is generally not entitled to sue for enforcement of the trust. See Alco Gravure, Inc., v. Knapp Foundation, 479 N.E.2d 752, 755 (N.Y. 1985); see also State ex rel. Nixon v. Hutcherson, 96 S.W.3d 81, 83-84 (Mo. 2003). However, the trial court also found that courts have recognized an exception to this rule "where an individual seeking enforcement of the trust has a 'special interest' in continued performance of the trust distinguishable from that of the public at large." Hooker v. Edes Home, 579 A.2d 608, 612 (D.C. 1990).

After considering how other courts have applied the doctrine of special interest standing, the trial court applied a five-factor test, often referred to as the Blasko test. See Mary Grace Blasko, Curt S. Crossley, David Lloyd, Standing to Sue in the Charitable Sector, 28 U.S.F. L. Rev. 37, 61 (1993)

4

(hereinafter, "Blasko"). The test is based upon a comprehensive survey of case law and it sets forth five factors to determine whether a plaintiff's interest is distinct enough from the public at large to justify conferring standing upon the plaintiff in order to enforce a charitable trust. See generally id. The factors are: (1) the extraordinary nature of the acts complained of and the remedies sought; (2) the presence of bad faith; (3) the attorney general's availability and effectiveness; (4) the nature of the benefitted class and its relationship to the charity; and (5) the social desirability of conferring standing. Id. at 61.

Applying the Blasko test, the trial court found that none of the factors weighed in favor of granting Second Church standing. Second Church filed a motion for reconsideration, which the trial court denied. This appeal followed.

## II. Analysis of Second Church's Claims

On appeal, Second Church argues that, even though the trial court properly adopted the Blasko test, it misapplied the factors. Second Church asserts that, under the Blasko test, as one of a limited number of potential beneficiaries under the trusts, it has a "special interest" in the Clause VIII Trust sufficient to justify standing. Moreover, Second Church contends that the trial court improperly reached its decision without the development of a factual record, while also faulting Second Church for not developing sufficient facts to demonstrate standing. Although the DCT agrees with Second Church that we should "recognize the standing of certain persons or entities that have a special interest in a particular charitable trust to enforce that trust," both the DCT and the trustees maintain that the trial court properly determined that Second Church lacks special interest standing. We agree with the DCT and the trustees.

### A. Standing Issue

We generally will not disturb the circuit court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law. In re Estate of Locke, 148 N.H. 754, 755 (2002); see also RSA 567-A:4 (2007). In this case, the parties dispute the applicable standard of review. Second Church argues that we should review the trial court's application of the special interest standing factors de novo. The DCT argues that the question of whether to adopt special interest standing is a question of law which we review de novo. However, the trustees and the DCT further argue that we should not disturb the trial court's standing determination unless it is plainly erroneous as a matter of law.

Because the trial court did not clarify how it reviewed the pleadings in determining that Second Church lacked standing, and there was no discovery or evidentiary hearing, we assume without deciding that the trial court viewed

5

the challenge to Second Church's standing as a motion to dismiss.[1]  When a motion to dismiss "challenges the plaintiff's standing to sue, the trial court must look beyond the plaintiff's unsubstantiated allegations and determine, based on the facts, whether the plaintiff has sufficiently demonstrated his right to claim relief."  Ossipee Auto Parts v. Ossipee Planning Board, 134 N.H. 401, 403-04 (1991).  Nonetheless, in this case, the material facts are not disputed; only their legal effect stands in dispute.  See Appeal of N.H. Right to Life, 166 N.H. 308, 311 (2014).  The issue of standing is, therefore, a question of law, which we review de novo.  Id.

The general rule is that potential trust beneficiaries, in suits involving charitable trusts, may not bring an action to enforce the terms of such a trust.  See Restatement (Third) of Trusts § 94 cmt. g at 8-9 (2011).  Instead, the attorney general (or the DCT, as his representative) has the statutory power and duty to represent the public in the enforcement and supervision of charitable trusts.  See RSA 564-B:4-405(c); RSA 7:20 (2013); Attorney Gen. v. Rochester Trust Co., 115 N.H. 74, 76 (1975) (the attorney general has the duty to protect the rights of the public in charitable trusts); Concord Nat. Bank v. Haverhill, 101 N.H. 416, 419 (1958); Restatement (Third) of Trusts, supra at 4.  As another court has framed the issue:

> Principally, the rationale for vesting exclusive power in a public officer stems from the inherent impossibility of establishing a distinct justiciable interest on the part of a member of a large and constantly shifting benefited class, and the recurring burdens on the trust res and trustee of vexatious litigation that would result from recognition of a cause of action by any and all of a large number of individuals who might benefit incidentally from the trust.

Hooker, 579 A.2d at 612.  Nonetheless, the Restatement as well as other jurisdictions have recognized an exception to this rule when a clearly identified class "has a justiciable interest in enforcement of the trust."  Id.; see Alco

---

[1] We note that the plainly erroneous language derives from case law and RSA 567-A:4.  RSA 567-A:4 states, in relevant part: "The findings of fact of the judge of probate are final unless they are so plainly erroneous that such findings could not be reasonably made."  Our case law has somewhat altered this standard and provides that "[w]e will not disturb the probate court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law."  In re Estate of Locke, 148 N.H. at 755.

In this case, because there was no evidentiary hearing, the trial court did not necessarily find any facts and it would be inappropriate to defer to its factual findings or rulings of law.  Nonetheless, the trustees and the DCT, at oral argument, advocated for a plainly erroneous standard because the trial court judge had presided over this case for several years and had the benefit of having the entire probate record before him when deciding the issue of standing.  Although this is true, we have the majority of the record before us, and, because the material facts are not in dispute, de novo review is more appropriate.

Gravure, 479 N.E.2d at 755-56 (concluding that plaintiffs had standing where they were a well-defined class of potential beneficiaries challenging the dissolution of the charitable corporation); Restatement (Third) of Trusts, supra § 94 cmt. g at 8-9.

Although we have yet to determine whether a potential beneficiary of a charitable trust has standing, our law supports the concept of conferring standing upon a third party if it establishes that it has a special interest. For instance, we have previously noted that "[w]hile the Attorney General . . . represents the public in the enforcement and supervision of charitable trusts, this [representation] does not preclude other interested parties from presenting their views particularly where they are acting for the benefit of the charitable trust as a whole." Concord Nat. Bank, 101 N.H. at 419. RSA 564-B:4-405(c) also implicitly allows special interest standing by providing that "[t]he settlor of a charitable trust or the director of charitable trusts, among others, may maintain a proceeding to enforce the trust." RSA 564-B:4-405(c) (emphasis added). Moreover, the comments to the Uniform Trust Code, upon which the New Hampshire Trust Code is based, see RSA ch. 564-B (2007 & Supp. 2018), contemplate that certain others may have standing based upon their special interest in the charity. See Unif. Trust Code § 405, Comment (2006) ("The grant of standing to the settlor does not negate the right of the state attorney general or persons with special interests to enforce either the trust or their interests." (emphasis added)); see also Unif. Trust Code, supra § 413, Comment ("[A] petition requesting a court to enforce a charitable trust or to apply cy pres may be maintained by . . . the state attorney general, or by a person having a special interest in the charitable disposition.").

Accordingly, we recognize the doctrine of special interest standing in matters involving charitable trusts. We must next determine how to apply this doctrine. Second Church argues that the trial court correctly adopted the Blasko five-factor test. Second Church further argues that the presence of any one factor by itself is sufficient to conclude that it has a special interest. See Blasko, supra at 61.

The trustees advocate for a more stringent test, which follows the test approved by the American Law Institute (ALI), that proposes five factors similar to the Blasko factors but requires a private party to satisfy all of the factors to demonstrate special interest standing. See Restatement of the Law Charitable Nonprofit Organizations § 6.05 (Tent. Draft No. 2, 2017) (approved May 22, 2017). The trial court considered this test but applied the Blasko test upon determining that the flexibility of the Blasko test better suits the pursuit of a just outcome. The DCT argues that the trial court properly adopted and applied the Blasko test.

We look to other jurisdictions for guidance on the application of the special interest standing doctrine. See N.H. Right to Life v. Dir., N.H.

7

Charitable Trusts Unit, 169 N.H. 95, 103 (2016) (looking to the decisions of other jurisdictions interpreting similar acts for guidance). The Arizona Court of Appeals adopted a modified version of the five-factor balancing test described by Blasko, giving special emphasis to the nature of the benefitted class and its relationship to the trust, the nature of the remedy requested, and the effectiveness of attorney general enforcement of the trust. Schalkenbach Foundation v. Lincoln, 91 P.3d 1019, 1026 (Ariz. Ct. App. 2004). In Alco Gravure, the New York Court of Appeals considered similar, albeit fewer, factors to determine whether the plaintiffs had a "special interest" in charitable funds and could maintain a suit. Alco Gravure, 479 N.E.2d at 755-56. There, the court focused on the well-defined class of beneficiaries and the fact that they were challenging the dissolution of the charitable corporation, as opposed to the ongoing administration of the corporation, to conclude that the plaintiffs had standing. Id.

Similarly, in Hooker, the District of Columbia Court of Appeals considered the nature of the class and the nature of the challenge to the trustees' acts in deciding whether to apply the special interest exception. Hooker, 579 A.2d at 614, 616-17 (concluding that the class of elderly, indigent women, who are eligible potential residents of a Trust-operated home, had standing to challenge the trustees' decision to put into effect a "major change from the manner in which the trust had been administered in the past"). The Supreme Court of Missouri likewise recognized that "[a] person . . . may have standing if he or she is entitled to a preference under the terms of the trust or if the person is a member of a small class of identifiable beneficiaries." State ex rel. Nixon, 96 S.W.3d at 84. The court also acknowledged that a person may establish standing if he or she "is entitled to receive a benefit under the trust that is not merely the benefit to which members of the public in general are entitled." Id. at 84-85 (quotation omitted) (concluding that the plaintiffs could not establish standing when they failed to meet the burden of "showing a clear, identifiable, and present claim to any benefits" from the trust).

After review of the factors that other jurisdictions consider relevant to a special interest standing determination, we agree with the trial court that the Blasko test is preferable because it provides a court with the flexibility to consider a variety of factors. Although Blasko suggests that "[t]he presence of any one . . . factor[] by itself can lead a court to decide that the plaintiff has a special interest in a charity," the article notes that, "[i]f a combination of elements is present, then a court can balance them against one another and reach a decision." Blasko, supra at 61. Depending upon the circumstances, some factors may carry more weight than others and, in New Hampshire, when evaluating whether a party has standing to sue, we generally focus upon whether the party suffered a legal injury against which the law or policy was designed to protect. See Petition of Lath, 169 N.H. 616, 620 (2017). Accordingly, because of the various interests that must be considered to determine special interest standing in the context of charitable trust matters,

8

we conclude that a balancing test of all five Blasko factors best comports with New Hampshire law.  We thus address each factor in turn.

### i. The Extraordinary Nature of the Acts Complained of and the Remedy Sought

As to the first factor, the trial court found that Second Church's request for an independent trustee, among other remedies, seeks to undo prior court orders and suggests remedies despite Second Church's "informative and thorough amicus submissions that the Court assumes the DCT has reviewed." The trial court therefore determined that Second Church merely disagreed with the DCT's judgment, and this disagreement is not sufficient to justify standing. Second Church argues that the trial court erred by: (1) focusing on the requested relief, rather than the extraordinary nature of the acts alleged by Second Church; and (2) failing to recognize that the bad acts committed by the trustees are extraordinary while the requested remedy is not.

Blasko recognized that "courts seem to be influenced from the outset by the nature and extent of the remedy requested."  Blasko, supra at 62.  When a requested remedy could be "highly intrusive in the administration of the trust," it is likely to weigh against a finding of standing.  See Schalkenbach Foundation, 91 P.3d at 1027-28.  When trustees seek to fundamentally change the charitable bequest by dissolving the nonprofit corporation or closing the facility created by the trust, and the plaintiffs seek to stop this action, then the plaintiffs are more likely to establish standing.  See Hooker, 579 A.2d at 616-17; Alco Gravure, 479 N.E.2d at 755.

To begin, we need not decide whether the trial court should have considered the extraordinary nature of the bad acts, because, upon our de novo review, we consider them now, and we conclude that Second Church has not demonstrated that the trial court's failure to consider the extraordinary acts is sufficient, by itself, to constitute reversible error.  See Gallo v. Traina, 166 N.H. 737, 740 (2014).  Accordingly, we examine the requested remedy in relation to the nature of the alleged bad acts.

Second Church alleges that the trustees engaged in self-dealing and have an embedded conflict due to their dual role as trustees and members of the board of directors of the Mother Church.  Furthermore, Second Church alleges, among other things, that the trustees have improperly favored the Mother Church when distributing the Clause VIII trust assets.  Second Church, therefore, seeks the "relief of having an independent trustee appointed to the Clause [VIII] [T]rust."

We find Schalkenbach Foundation to be instructive under these circumstances.  Schalkenbach Foundation, 91 P.3d at 1027.  In Schalkenbach Foundation, the appellants alleged that the Foundation had been

9

systematically diverting funds from their approved purpose to improper uses, which the court found implied a request to remedy the situation by the appellants' participation in and influence of the daily operations of the Foundation. Id. at 1027-28. The appellants specifically requested, among other things, to "replace the Foundation's officers and directors with persons interested in carrying out the terms of the charitable trust." Id. at 1021. The court concluded that the remedies that the appellants wished to impose were "highly intrusive in the administration of the trust, which could open the Foundation to further litigation by other potential or disappointed beneficiaries." Id. at 1028.

Similarly, here, because Second Church seeks the appointment of an independent trustee to oversee the administration of the trust, including the distribution of funds, this request would influence the daily operations of the trust and the ongoing administration of the trust. Consequently, this remedy could expose the charity to vexatious litigation by Second Church or other disappointed beneficiaries that would still be concerned with the distribution of funds even after the appointment of an independent trustee.

Moreover, Second Church's requested remedy is unnecessary under the circumstances because the trial court has already taken steps to address the alleged bad acts. Notably, in its March 2018 order, the trial court acknowledged the embedded conflict and imposed certain conditions that addressed this conflict, including, inter alia, requiring the trustees to furnish to the DCT a schedule of recipients of the Clause VIII distributions. The March 2018 order also partially amended the 1993 order "to the extent it gave priority to church repair." Therefore, in relation to the nature of the trustees' alleged bad acts, the appointment of an independent trustee would be unnecessary under these circumstances. Accordingly, this factor weighs against standing.

### ii. Presence of Bad Faith

As to the second factor, Second Church argues that the evidence that the trustees acted in bad faith is substantial. Blasko notes that the presence of fraud or other deliberate misconduct is not a factor which courts necessarily discuss when evaluating a plaintiff's special interest, but it is nevertheless an element which influences their decisions. Blasko, supra at 64. "When alleging fraud . . . the plaintiff must specify the essential details of the fraud, and specifically allege the facts of the defendant's fraudulent actions. It is not sufficient for the plaintiff merely to allege fraud in general terms." Lamprey v. Britton Constr., 163 N.H. 252, 262-63 (2012) (quotation omitted) (standard for withstanding a motion to dismiss when alleging fraud).

Second Church specifically contends that the trustees acted in bad faith when they distributed the Clause VIII funds solely to the Mother Church. However, as the DCT counters, Second Church fails to consider the 1993 order

10

which required the trustees to make distributions of the Clause VIII Trust's income primarily to repair the mother church. Second Church also asserts that after being ordered by the trial court to submit independent audits on the accounts, the trustees submitted non-independently prepared unaudited financial statements and, given the existence of the embedded conflict, this conduct represented a clear example of bad faith. The trial court found that the accounts were accepted for several years by the then-DCT and were implicitly approved by the court. The trial court acknowledged that, by doing so, the trustees committed misconduct. However, the court further found that Second Church's allegations were insufficient to demonstrate outright fraud or bad faith. We agree.

Second Church's allegations do not demonstrate that this conduct amounts to bad faith or fraud that directly injures Second Church. See Blasko, supra at 64-65. The assertion that the conduct represented bad faith merely because of an embedded conflicting fiduciary obligation is insufficient. See Lamprey, 163 N.H. at 256 (explaining that the threshold inquiry on a motion to dismiss involves testing the facts alleged against the applicable law, and that we need not accept allegations that are mere conclusions of law).

Second Church further relies upon Matter of Green Charitable Trust, 431 N.W.2d 492 (Mich. Ct. App. 1988), to argue that the trustees' mismanagement is sufficient to confer standing. In Green Charitable Trust, named beneficiaries of a charitable trust and the state attorney general brought petitions against the trustees alleging that the trustees mismanaged the sale of property owned by the charitable trust. Green Charitable Trust, 431 N.W.2d at 494-95, 505-06. The court upheld the trial court's finding that the trustees violated their fiduciary duty to the beneficiaries by mismanaging the sale of the property and having a conflict of interest in representing both the buyer and seller of the property. Id. at 497, 504.

Green Charitable Trust is inapposite to the circumstances here. First, standing was not at issue in Green Charitable Trust. Second, here Second Church is a potential beneficiary, whereas, in Green Charitable Trust, the named charitable trust beneficiaries together with the attorney general challenged the actions of the trustees. Id. at 494-95. Thus, the reasoning in Green Charitable Trust does not provide support for Second Church's assertion that the trustees' alleged mismanagement demonstrates bad faith sufficient to weigh in favor of standing. Moreover, Second Church's allegations of mismanagement — that Mother Church received all distributions, the trustees failed to restore the priorities of the Clause VIII Trust after the 1993 order, and the trustees failed to have independent audits of the accounts — are insufficient to demonstrate bad faith that weighs in favor of granting it standing.

11

In sum, while Second Church's allegations may demonstrate misconduct, they fail to demonstrate fraud or bad faith. Thus, we agree with the trial court that this factor is neutral and neither weighs against nor in favor of conferring standing.

### iii. Attorney General's Availability and Effectiveness

Second Church next argues that the DCT has not been effective in policing the trustees' misconduct. The trustees disagree and argue that the DCT has been available and effective in enforcing the trusts. The trustees further contend that this finding is the most important Blasko factor to consider when deciding whether to grant special interest standing.

As we previously discussed, the DCT is empowered to represent the public and potential beneficiaries of New Hampshire charitable trusts. See RSA 564-B:4-405(c). When assessing this factor under the Blasko test, "the nature and level of the attorney general's involvement can profoundly influence a court's decision to grant or deny standing." Blasko, supra at 67. "[W]here the attorney general is heavily involved in charities regulation, courts generally will take a dim view of private parties attempting to step into the attorney general's role to seek enforcement of charitable fiduciary duties." Id. at 70. Under this factor, we consider whether the attorney general is able to enforce the trust or whether the lack of enforcement is due to a conflict of interest, ineffectiveness, or lack of resources. Schalkenbach Foundation, 91 P.3d at 1028 (attorney general's decision not to enforce the trust was not influenced by lack of resources and there was no evidence of neglect of the public interest; thus, this factor weighed against a finding of special interest standing).

Second Church alleges that the DCT allowed the trust to "fall into the exclusive control of the conflicted . . . trustees," participated in the crafting of the 1993 order that "turned the Trust priorities upside down," and sat idly by as the trustees diverted "some $26 million in funds to their preferred Mother Church." We disagree with Second Church's characterization of the DCT's oversight. As the trial court noted, during the long history of the trusts, the DCT's performance of his duties has been mixed and arguably deficient. However, the record also demonstrates that during the pendency of the present dispute, the DCT has been an active participant, has acknowledged the embedded conflict with the trustees, and suggested measures to mitigate the effect of that conflict. For instance, during a motions hearing, the trustees acknowledged that the DCT had certain objections to the accounts filed in 2016 and that the two parties then proceeded to work together to resolve those concerns. In addition, in the DCT's memorandum concerning the standing of Second Church, he recognized the "embedded conflicting fiduciary obligations," while also asserting a plan to, inter alia, review the trustees' process for making distributions and review the trustees' resolution regarding the conflicting fiduciary obligations.

Nonetheless, Second Church maintains that the DCT is ineffective in addressing the embedded conflict with the trustees and, therefore, allowing Second Church to intervene as a party familiar with the trusts "is the best, and perhaps only, way to protect the Trust assets." Second Church relies upon the reasoning in Holt v. College of Osteopathic Physicians and Surgeons, 394 P.2d 932 (Cal. 1964), in which the court noted that "[t]he administration of charitable trusts stands only to benefit if in addition to the Attorney General other suitable means of enforcement are available." Holt, 394 P.2d at 936. In Holt, minority trustees brought suit against the charitable corporation and the majority trustees alleging that the defendant trustees acted contrary to the charitable purposes of the college. Id. at 934. The attorney general filed an answer concluding that the suggested changes to the operation of the college would not be detrimental to the public interest and did not warrant legal action by its office to prevent such changes. Id. The attorney general also claimed not to have information that the trust assets were being diverted from their charitable purpose, which, as the court noted, illustrated the concern that the attorney general "may not be in a position to become aware of wrongful conduct or to be sufficiently familiar with the situation to appreciate its impact." Id. at 935-36. The court held that the attorney general applied the wrong test in deciding not to take legal action because the assets of the college could only be used for the purposes for which they were received in trust, not in any manner that was not detrimental to the public interest. Id. at 936.

Second Church's reliance on Holt is misplaced. First, the plaintiffs in Holt were minority trustees, whereas here, the appellant is a potential beneficiary. See id. at 934. Second, the attorney general in Holt applied the wrong test when determining whether to take legal action, while here, the record demonstrates that the attorney general is actively involved in overseeing the administration of the trust. Second Church fails to demonstrate that it is better suited or more qualified than the attorney general to ensure the proper enforcement of the trust. Despite Second Church's assertion that it is "extensively familiar" with the relationships among the Mother Church, the Christian Science Publishing Society, and the Clause VIII Trust, Second Church does not allege or explain, not only how it is familiar with the trust, but also how any "familiar[ity]" with the trusts places it in a better position than the DCT. Moreover, Second Church does not allege that it has access to documents and information that the DCT does not have. In fact, Second Church's pleadings to the trial court indicate that it relied upon documents it received from the DCT as factual support for its allegations regarding the trustees' actions and the trustees' relationship with the DCT.

Second Church also alleges that "[g]iven the number of questionable acts taken by the . . . Trustees, it may be that there are simply too many aspects of the administration of the Clause [VIII] Trust for the DCT to effectively police." To support this contention, Second Church asserts that it wrote a letter in January 2017 alerting the DCT of potential mismanagement of trust assets,

13

and Second Church believes that the DCT has not acted on that information. However, as mentioned above, the DCT has been actively involved in this matter and has taken steps to address the embedded conflict. The trial court's March 2018 order also ensures the continued involvement of the DCT by requiring the trustees to submit to the DCT "along with the annual audited accounts, a schedule of recipients of Clause VIII distributions and provide affidavit(s), under oath, that these distributees are in fact 'third party recipients' and not affiliated with the Mother Church." The DCT's reluctance to agree with Second Church to seek the appointment of an independent trustee is not sufficient to support Second Church's allegation that the attorney general is not involved or is ineffective.

Thus, we agree with the trial court that this factor does not weigh in favor of granting standing to Second Church. In addition, we iterate the trial court's encouragement of Second Church to continue to share information and its concerns with the DCT.

### iv. Nature of the Benefitted Class and its Relationship to the Charity

Second Church argues that it is part of a defined class of entities that bears a special relationship to the charity. Courts have found special interest standing where the class of entities is "sharply defined and its members are limited in number." Hooker, 579 A.2d at 614. "[A] plaintiff should have a direct and defined interest, distinct from that of the general public, in the enforcement of the charitable obligations at issue to claim a 'special interest' in the charity." Blasko, supra at 70.

Second Church contends that it is a branch church, one of 1,400 Christian Science churches, that is defined by its unique connection to the Mother Church. Second Church relies upon several cases to argue that other courts have "granted special interest standing to more attenuated persons." For instance, Second Church relies upon Y.M.C.A. of City of Washington, where members of a local branch brought suit claiming that the YMCA breached a charitable trust by allowing the local branch building to deteriorate and by closing it. Y.M.C.A. of City of Washington v. Covington, 484 A.2d 589, 591 (D.C. 1984). In holding that the plaintiffs had special interest standing, the District of Columbia Court of Appeals concluded that the members of the branch received a particular benefit from this local branch and the closing of the building injured them in particular. Id. at 592. Similarly, in Alco Gravure, the plaintiffs — a corporate employer whose employees were intended beneficiaries of the Foundation, and two individual employees of the corporate plaintiff — constituted a class of potential beneficiaries of the Foundation. Alco Gravure, 479 N.E.2d at 753-54 ("The Foundation's primary purpose was . . . to assist employees of the founder's corporations and their families."). The plaintiffs were entitled to a preference in the distribution of the defendants'

funds and were therefore challenging the dissolution of the Foundation and the complete elimination of their status as preferred beneficiaries of the funds. Id. at 754-56. The court found that the plaintiffs had special interest standing because the class of beneficiaries was both well-defined and entitled to a preference in the distribution of the defendants' funds. Id. at 755. The court also granted standing because it found that the policy reasons for limiting standing did not apply to the circumstances in that case. Id. at 756. Specifically, the court concluded that "the present action concerns not the ongoing administration of a charitable corporation, but the dissolution of that corporation and the complete elimination of the individual plaintiffs' status as preferred beneficiaries of the funds." Id.

The cases relied upon by Second Church concern plaintiffs that comprise a sharply defined set of potential beneficiaries with a greater interest in the charitable trust and corporation than the general public. Second Church fails to demonstrate that it is in such a class. The income from the Clause VIII Trust is to be utilized for the purpose of promoting and extending the religion of Christian Science. This broad language dispels any notion that the distribution of the income is limited to a small, identifiable class. The trust was intended to benefit more than just the branch churches. Moreover, Second Church is not alleging a harm directly related to its church, but rather is challenging ongoing administration that could impact all of the potential beneficiaries. Thus, the class of potential beneficiaries is not sharply defined. Because Second Church is not in a small, well-defined class, we agree with the trial court that "the potential for vexatious litigation is heightened." We are not persuaded by Second Church's attempt to alleviate this concern by arguing that the appointment of an independent trustee "will likely eliminate the need for the special interest standing it seeks." Accordingly, this factor weighs against standing.

### v. Subjective Factors and Social Desirability

Second Church next argues that it is socially desirable to grant it standing. Blasko describes this factor as somewhat of a catch-all factor, applying to "those cases where there seemed to have been an egregious wrong which would otherwise go uncorrected." Blasko, supra at 75.

The trial court found that although it remained "concerned about the embedded conflict," it did not find Second Church's claim that it "is 'well positioned to monitor and enforce the terms of the Trusts' due to its status as a branch church and knowledge of the religion . . . [to] weigh[] heavily in its determination of standing." We agree. The DCT has acknowledged the conflict and is actively involved in the oversight of the trust, and Second Church has been encouraged to share its perspective with the DCT. Importantly, under RSA 7:20, the DCT "shall have and exercise all the common law and statutory rights, duties, and powers of the attorney general in connection with the

15

supervision, administration, and enforcement of charitable trusts." See also RSA 7:19-:32-a (2013 & Supp. 2018).

Consequently, after considering all of the factors together, we conclude that Second Church has failed to demonstrate that it has a special interest in the Clause VIII Trust sufficient to grant it standing to petition for the appointment of an independent trustee to the trust.

### B. Procedural Issue

Finally, Second Church argues, in passing, that the trial court erred when it denied it standing on a limited record. Specifically, Second Church asserts that the trial court erred by "effectively" requiring that it "prove each Blasko factor by a preponderance of the evidence" without the benefit of discovery and without holding an evidentiary hearing. However, the record does not show either that the trial court used a preponderance of the evidence standard when it applied the Blasko factors or that Second Church complained to the trial court about its inability to obtain discovery.[2] See Halifax-American Energy Co. v. Provider Power, LLC, 170 N.H. 569, 574 (2018). Similarly, there is no evidence in the record that Second Church requested an evidentiary hearing or argued to the trial court that it erred by not holding one. See id. Accordingly, we decline to address these arguments because Second Church did not provide the trial court with an opportunity to address them.

Because we conclude that Second Church lacks standing, we need not address its argument requesting the appointment of an independent trustee. We reiterate the trial court's sentiment that Second Church is encouraged to share its perspective and concerns with the DCT, and, when appropriate, seek to file as amicus curiae with the trial court.

Affirmed.

LYNN, C.J., and HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.

---

[2] We observe that the material facts are largely undisputed. In addition, the record indicates that Second Church sought additional time to obtain discovery from the DCT and the Mother Church. Second Church never sought the trial court's permission or authorization to either engage in or compel discovery and, thus, did not raise this argument before the trial court.